You'll probably need some preparation. All right, we're going to hear next West Neck Community Association v. JBWK. And Mr. McIntyre, whenever you're ready, we'll hear from you. Thank you, Your Honors. May it please the Court, John McIntyre, on behalf of JBWK, the appellant, then cross-appellee in this matter. Your Honors, the declaration in this case, while a I think you probably need to pull the microphone up a little bit, at least for me. Thank you. My apologies. The declaration in this case, although it's a long document, structurally is very simple. The declaration starts with It's a long statement to make. It's got some inherent inconsistencies, and it's I've read the whole document in several parts multiple times. And you rely on one section that sort of protects declarants from certain things, but there are other sections that seem to suggest that the restrictions on land use and commercial use apply to everybody. And so the District Court read it that way, and I'd be interested in hearing how you address that. Yes, sir. Except with regard to, I will say this, except with regard to the rules and restrictions, which we did not challenge the District Court's decision that those are limited to residential, recreational, and related uses. Because, frankly, there was no need to challenge that. The remainder of the provisions, I would suggest, are not contradictory. And that's because the introductory sections of the declaration start very broad. They use broad terms like all property shall be owned, conveyed, and used, subject to all provisions of the declaration. What's wrong with that? Nothing, Your Honor, except that the operative provisions of the declaration do restrict those provisions to certain classes of property or certain people. And taking it outside of the context of the appeal, look at membership interests. The introduction states that all owners of real property are members of the association. I believe the quote is, the association is comprised of all owners, small o, not large o, of real property in West End. 7.3 defines membership interests in the declaration. 7.3 says there are two classes of membership interests, Class A members and Class B members. Class A members shall be all capital O owners except the Class B member, if any. The sole Class B member shall be the declarant. So the introduction uses broad terms saying it applies to everyone. The specific provision dealing with membership interests limits that to capital O owners and the declarant. That's the structure of the declaration. There is a section here called 6.1 that says maintenance of units and private amenities. Yes, sir. And the private amenities, of course, is a golf course, right? Currently, it would be a golf course or we're using it, frankly. I understand now the land is being used differently, but it's that golf course land. Yes, sir. Okay. That's correct. And in that, it says each owner shall maintain his or her unit or private amenity, respectively. And the key thing is here, and all landscaping and improvements comprising the unit or private amenities in a manner consistent with the governing documents. Now, your argument is that the first use of the word owner is capitalized and therefore refers to a unit owner. And that's absolutely correct. But then it adds, it uses that term or sort of repeats it. It says owner of a private, implicit is owner of a private amenity. And that is left out. So it says owner shall maintain his or her unit or private equity. And it should be, if it were grammatically more correct, it should have used lower case owner because capital is a defined term. And capital, it means owner of a unit. But then it says owner, each owner shall maintain his or her unit or the owner of a private amenity shall maintain this in accordance with the documents. But the title of the whole thing talks about maintenance of units and private amenities. That's 6.1. And then 6.2 is maintenance of neighborhood property. And what it tries to do is cover all the properties to say they have to remain consistent with the declarations, the documents on file. I would disagree with that, Your Honor. Okay. There is nothing in the definition of private amenity that, one, limits it to the golf course. So, for example, there are condominiums- It doesn't matter whether it limits it. The golf course is a private amenity, isn't it? The golf course was a private amenity, Your Honor. Yeah. And so the private amenities have to be maintained in accordance with the declaration documents. Again, I would disagree with that, Your Honor. The term owner describes the individual who owns either the unit or the private amenity. There is nothing in the declaration that prohibits an owner, that is someone who owns residential units, such as Baymark Construction, when it owned both the golf course and the entire development, the various neighborhoods, from being a capital O owner of both a unit and a private amenity. I think trying to insert a small o owner into that sentence is rewriting that sentence. Well, the only person that was in that circumstance was the declarant who owned both. That would be correct in that instance, Your Honor. But at any instance. I mean, the fact is that you would have to have a peculiar circumstance where the declarant- Well, who else would it be? Your Honor, the way this development was constructed, Baymark carved it up into various parcels, various neighborhoods, and sold those off to other developers in certain circumstances. So if I'm developer A who acquires a part of that property, and I construct some homes, and let's say it's a condominium because there are condominiums in here, and I include a small park, that's going to be a private amenity. Well, I'm not sure. That's a pretty strained hypothetical when you have the owner who did own some units and who owned the private amenity, and the only private amenity was the piece of land on which the golf course was lying. I just use that for identification purposes, not as a golf course. But the question is whether that land is subject to the declarations, and not only does the introductory document say all property is subject to the amenities, but then the maintenance clause says the same thing, and the declarant happened to be an owner of all units, actually, before the first one was sold, and the private amenities. And then it transferred it, Your Honor, to a non-owner, Baymark Golf, and that's the purpose of that section. It allowed the declarant to do that. Well, that person who took away from the original declarant still was responsible for all the obligations imposed on the first declarant. The first declarant was the owner of the units and the private amenity, right? The first declarant was the developer. The first declarant was the developer, Your Honor. Okay. The developer owned units he was trying to sell, and he owned the private amenity, the land that was then designated as a golf course. That's correct. He owned both. That's correct. And that clause clearly applied to him, right, at that point? Well, at that point, yes, it would have applied to him. Okay. And so now, as time goes on, he sells that or he sells his interest to another declarant, but I don't think any subsequent declarant can gain more rights than the original developer had. Again, I don't think it's a question of gaining more rights under 6.1a, Your Honor. The court is, Your Honor, is hypothetical, inserts into that section, that sentence, an additional provision. Any capital O owner must maintain its unit, and then the court's inserting, and any small O owner must maintain the private amenity in accordance with the governing documents. It's rewriting that sentence. That's not rewriting the sentence because the declarant did own units before they were sold, but the next sentence, next clause says, the next clause says, and all landscaping and improvements comprising the unit or private amenity in a manner consistent with these declarations. And as the district court pointed out, under the private amenity sections, the association is not allowed to impose landscaping requirements on the private amenity. It's not the association. It's the documents. The exhibits to the declaration, which provide for the land use, is what's applicable. Well, the provisions which apply to. . . Which is number C? Exhibit C? Exhibit C, Your Honor, is not the community-wide standard. Exhibit C is the rules and regulations. That's governed by section 4. No, no. Which one's the regulations of uses? That's section 4, Your Honor. What about Article 17? Article 17 governs private amenities, which I assume includes at least the golf course was a private amenity. I don't know if now it's. . . My understanding is there is no private amenity on your client's land at this time. Technically. . . It's undeveloped land. Oh, I apologize, Your Honor. Technically, the district court found there was a private amenity. We're allowing certain residents to walk on the trails. Oh, and there's a wedding venue, right? Isn't there also a wedding venue? Yes, Your Honor. There's a wedding venue in the clubhouse. The clubhouse is renting out the. . . Well, the wedding venue company is renting out the clubhouse and the associated parking, as well as a small portion. And so in section 17, the general section, it seems to provide broad discretion for the owners of private amenities to have the right from time to time in their sole and absolute discretion with or without notice to amend or weigh the terms and conditions of their respective private amenities, including without limitation. I mean, it seems like under this section, those owners of private amenities can kind of do whatever they want with their land or at least change the conditions. That's true, Your Honor. And, in fact, that also echoes 10.3, which deals with supplemental declarations. Under 10.3, the declarant is entitled to execute and record a supplemental declaration, either expanding or restricting any provision of the declaration. So, again, to say that 6.1 is limited and, therefore, must always track with a private amenity, a supplemental declaration can fix that. And that's even acknowledged in the second half of the first sentence of 6.1, where it references that the association with respect to a unit has to maintain the unit if it's in a supplemental declaration. Again, something that 10.3 expressly provides for. And 11.3 also provides a right to develop to the declarant. That's correct, Your Honor. And the district court determined that your client is the declarant. That is correct, Your Honor, and the assignee of the declarant rights. There's two separate concepts. The being the assignee of the declarant rights themselves is not really an issue in the appeal. Whether we are the substitute declarant is an issue. That has been raised by the association. It has been raised? They've raised the question of whether we are truly the substitute declarant. They have not challenged the fact that we took an assignment of the declarant rights under 11.7. I would argue it's largely a distinction without a difference, because under Virginia law, an assignee steps into the shoes of the ass, or as if they were the original party under the contract. You would agree that any transferee carried the obligations, assumed the obligations that the initial declarant had? Oh, absolutely. Absolutely. I thought so. I don't think the assignment of rights allows for a restriction of those rights. I would point out 10.3 does allow for a restriction of those rights through a supplemental declaration. Your Honors, that's essentially our position in this case. Can I ask about the ADR procedures? Why weren't they complied with here? It's a condition proceeding in the contract that the parties comply with the ADR in the contract, and it doesn't seem like either side is adequately complied. Your Honor, we tried to. The record is clear that we attempted to schedule mediation. We had intended to plant more trees on the property. We had several trees on there. That was the subject of the first lawsuit. The first lawsuit was non-suited, and then we wanted to plant more trees on the property. We wrote a letter saying we'd like to plant more trees. Let me know if you have a problem with that. I actually scheduled tentatively mediation through McCammon Group. The association's position was that it didn't want to go through mediation, which it's entitled to do. There's nothing wrong with them taking that position. But as I understand the contract, if they take that position, then they can't assert their rights. I would not agree with that, Your Honor. Honestly, I think the way the ADR provision works is if you raise a claim, if you provide that notice of a claim, which is a preliminary requirement, and then you don't go to mediation, then you waive that claim. But that's the only time waiver really occurs. So they, as the respondent, if you will, to our request that we wanted to plant more trees, they're entitled to say they don't want to go to mediation. Well, that's a little euphemistic. You wanted to plant the trees to sell them. You wanted a commercial operation. We did. Okay. We did. And that's part of the problem. And a commercial operation is prohibited by the use. Strictly it is, Your Honor. And that's one of the issues the district court raised. I thought that's the whole issue here is whether the property where the golf course was is subject to the restriction against commercial use. It's not so much whether it's subject to or not, Your Honor. Again, it's the structure of the declaration. And it's not the most elegant, no question. But, Your Honor, if you look at 11.3, 11.3 says that any owner of property in West Neck is prohibited from challenging a change in use of property at West Neck. That's any owner. It doesn't say anything about the association. The association is an owner, Your Honor. It was undisputed they own the common areas. It wasn't capital O owner. That's a small O owner. And they are a small O owner. So the association is an owner of property in West Neck. And that section says you cannot challenge a change in use unless your property and the subject property are in the same neighborhood. And it was undisputed our property is not in a neighborhood. Again, that's the structure. I'm not saying it's an ideal structure. I'm not saying it's even a good structure. But that's how it was drafted, to give Baymark the maximum flexibility to do what it needs to do. I see my time is up, Your Honors. Thank you. We'll hear from Mr. Baumgartner. Good morning, Your Honors. My name is Mark Baumgartner on behalf of West Neck. Judge Niemeyer pointed out at the beginning that this is a convoluted document. And I've had the misfortune actually of litigating this document twice in two different communities that used almost the exact same document. I gather you didn't draft it then. I did not draft it. The document was drafted, I am told, by the same law firm that drafted the documents for Disney World's developments. And the developer thought that's a good drafter. It is a very convoluted document. And even though I've litigated it twice, I repeatedly go back to provision after provision after provision. I think that the most helpful provisions in this case are the introductory provisions that make it clear that the purpose of this document is to create a cohesive community that is subject to a community-wide standard to create a development that people can live in and be pleased with. And that applies to all properties. And I think the reading of 6.1a, where it specifically says that the owners of a unit or a private amenity clearly intends that a private amenity is going to maintain its property in accordance with a community-wide standard. Yes, there's some latitude in perhaps the exact way it's going to do that. A golf course is going to be maintained in a different way than a residential unit. But nonetheless, both need to be maintained to the community-wide standard. And so I think the district court was absolutely correct in that regard. In addition, the JBWK concedes that Exhibit C, the rules and regulations apply to all properties. And Section 1 of Exhibit C talks about that it must be restricted to residential and related uses. But Section 3 of those restrictions specifically also says that, and this is on page 128 of the Joint Appendix. Subsection 3, prohibited conditions, the following shall be prohibited at the properties. That's all properties, not all owners, not capital O owners, not lowercase owners. At the properties, and JBWK consists, they concede that they are part of the properties. Plants, animals, devices, or other things of any sort whose activities or existence is in any way noxious, dangerous, unsightly, unpleasant, or of a nature as may diminish or destroy the enjoyment of the properties. And that absolutely demonstrates that the intent of the document is clear. And I believe it was Judge Berner that pointed out Section 17 that applies to the private amenities. And 17.10, in fact, imposes an affirmative obligation on private amenities. And it says private amenities shall cooperate and assist the association in maintaining the community-wide standard. So I think it's disingenuous for private amenity to say, yeah, we're going to cooperate and assist in maintaining this community-wide standard. Except for our property, we're going to let it grow up in a bunch of weeds around the edges. We're going to put up a spite wall. If you complain, we're going to put up a wall just in front of your house, not your neighbors, because they didn't complain. And we're going to grow a tree farm on this property. Those are not actions that are consistent with the requirements of Section 17.10. Was there a prohibition of commercial activities? I thought there was, but I may be wrong. There is. It's in Exhibit C. Exhibit C. JA 125 and 127. Thank you. Thank you, yes. 125, 127 restricts that. In addition, there's also restriction on violations of zoning. And it's in the record that this property was rezoned subject to proffers. And the proffers required that the property be developed in accordance with the master plan. And the master plan shows a golf course on this property. It doesn't show a tree farm. So the operation of a commercial tree farm would also violate the zoning proffers. And the Exhibit C prohibits anything that violates zoning and allows the association to enforce the declaration in that regard. What about the provision that allows for amendments? Yes, Your Honor. The amendments. So there are amendments allowed. And so long as the declarant owns property within the community, the declarant's consent is required. But in this case, Baymark, who was the prior declarant before attempting to assign its rights to JBWK, no longer owned any property within the community. As has been noted, the golf course had been conveyed to a different entity, Baymark Golf. The Baymark did not assign declarant rights to Baymark Golf. And so Baymark no longer owned any property within the community. Therefore, Baymark's consent was not required. What JBWK is trying to do is resurrect dead declarant rights. Well, the district court found that JBWK is the declarant. If we agree with that, then wouldn't the declarant have the right under the agreement to make any amendments, including to this provision regarding commercial development or businesses being operated on the property? I understand the question now, Judge Berner. The declarant can make certain amendments, but I don't believe that the scope of the amendments that would be allowed by the declarant would allow the declarant to change those provisions. Where is that limit found in the document? The limitation is with regard to the 10.3, I believe, addresses property that is added to the community and the time for the addition of additional properties has passed. And then there's no other unit. 10.3 talks about properties with a capital P, and then properties are defined to include, I believe, the property that is at issue here. So it says declarant may subject any portion of the properties to additional covenants and easements, including covenants obligating the association and additional covenants and easements. It just seems incredibly broad to me that the declarant essentially can make changes. It does. And then it says at the last sentence, any such supplemental declaration may supplement, create exceptions to, or otherwise modify the terms of this declaration as it applies to the subject property in order to reflect the different character and intended use of such property. So there are certain limitations on that. And the fact is that the declarant did not make any amendments. So as far as amendments subject to 10.3, they're not before the court. The declarant did not make any amendments. The question is not whether it can in the future. It has not made any. And our argument on the cross appeal is that the district court erred in finding that it was a successor declarant. At no time, first of all, and there's two reasons for that. First is that in order to be successor declarant, the property has to be obtained for the purpose of development and or sale. That's a specific purpose for the acquisition of the property. And in the deposition of the designated representative of JBWK, he testified that when WCC Capital first purchased the property, it was going to quickly sell the property maybe to the association, maybe to somebody else. So there was a speculative, is what he said. There was no distinct plan, but it was speculation. Then, however, they decided to start this farming operation, and JBWK was initially just a lessor. It was leasing property for the purpose of running this tree farm. They then did a merger, and I think it's significant that the successor in that merger was the operating entity, and that's what JBWK's representative testified. That as we learned that we were going to be here for a while, we decided to have this operation of a tree farm running a tree business, and we merged into the operating entity. That's what the deposition said. Now, later in summary judgment, they did declarations and then said, well, you know, the property was still up for sale, but I don't think the declaration really contemplates every property is for sale at some point. There's an old saying, everything's for sale. It just has to be the right price. But the fact of the matter is, after the merger with JBWK, the purpose of JBWK was to operate a tree farm. After that, they had no other plans. They were talking to people. They were doing all kinds of things, but the operation of JBWK was a tree farm. And on summary judgment, the court recognized that there was a conflict regarding that essential fact, and on summary judgment resolved that conflict between deposition testimony and an affidavit, quite self-serving affidavit done by the JBWK's representative and JBWK's owner, Chris Coleman, and Mr. LeClaire, that said, oh, well, you know, our purpose was to sell it. That's not what the deposition testimony was, and I think that's the type of credibility determination. When it comes to determining intent of a party, it is particularly ill-suited for resolution in summary judgment. I don't understand why that makes one hill of beans difference. It seems to me that if JBWK, whatever their purpose was for organization, merged with a person subject to the declarant obligations, that corporation is going to be subject to the declarant operations, at least with respect to this property. Now, they may want to operate tree farms in other towns and other places, but it's just an assignment as a district court found. It's just an operation of law. You merge with somebody, which is a declarant in this case, and that declarant has obligations with respect to this property. And so he's going to be bound by whatever this property requires. He can't succeed to more. And the argument is, well, he's organized to operate in a commercial property, but sure, he may be organized to operate a commercial property, but he can't operate it after he assumes those obligations in the merger. Certainly he doesn't rise above the level of the declarant. No. Under no circumstance would that successor— And that's what the district court found. It's a legal succession of assignments of declarant's rights and obligations. And the end of the line was JBWK, and there's no dispute. They don't dispute the fact that it is subject to the benefits and obligations of the declarant. They certainly don't dispute that the property is subject to the declaration. No, no. I'm talking about whatever rights the declarant has or whatever obligations the declarant has are imposed on JBWK. And that, to me, is a non-issue in the case. Well, that is an issue on our cross-appeal because we dispute the fact that— I know you dispute it, and I don't understand it. Okay. And the reason for that is the declaration requires two things for someone to be a successor declarant. They have to hold title to property in the community, and they have to be identified as the successor declarant in the recorded document. And in this case, when there was first a purported assignment of declarant rights done in November of 2021, and that assigned declarant rights allegedly to JBWK by a defunct corporation. Baymark was the original. They ceased—they terminated their existence in 2020. And so they were no longer the declarant. They no longer owned any property in the community. At that point in time, the trustee in liquidation purported to assign rights of this defunct entity to JBWK, which also did not own any property. Does JBWK—do they own the golf course land? They do now, but they did not win the right for first assigned. Well, they do now. They succeed as a property owner, the owner of that amenity. They're subject to whatever this document provides, aren't they? They absolutely are subject to whatever the document provides. Our argument is that they don't have these super declarant rights that died in 2020 when the Baymark terminated its existence. I don't know why not. Where was there a reduction in any rights? When you assign a land—assign property, a land subject to these documents, then you are the declarant. But the declarant—the amendment provisions in the declaration say— But there's no amendment made, you said. It's irrelevant. The association did make an amendment in August of 2022 in recognition of the fact that there was no declarant. And the declarant right—the JBWK has asserted that the declarant has a right to consent to any amendment. However, that right only survives so long as the declarant owns property that are subject to the declaration. So once the declarant no longer owns property subject to the declaration, its consent rights went away, and that happened in 2020. So I'd like to reserve the rest of my time.  Thank you. All right. Mr. McIntyre. Thank you. I'll try and be very brief. First, I disagree with the association's statement that Baymark does not own any property in the—covered by the declaration. The Affidavit of Pay and Favor, which is found at JA-765, which was our expert witness, indicated that it owns, among other things, Riddick Lane. If you look at Exhibit A to the declaration, which defines the capital P properties, that includes Riddick Lane. So Baymark does still—it's a spur of peace, but it still owns property which is subject to the declaration. Your Honor, getting to your question again about 6.1, looking at it another way, the community-wide standard, and this is at JA-59, the community-wide standard is defined as the higher of the minimum standards, which is the architectural guidelines, the restrictions and rules, the resolutions, and examples of the board and the declarant, or the prevailing standards. So the architectural guidelines are part of the community-wide standard. 5.1 says the architectural guidelines do not apply to the declarant's activities. Yeah, but we're not talking about architectural. We're talking about the use—commercial use provision— Your Honor, we don't dispute that. —in the rules, and that's not covered by the architectural, is it? The architectural guidelines govern things like fences— I understand. —and whatnot. We're not talking about that. We're talking about the rules and—what is it entitled? Rules and— The rules and regulations? Yeah. We didn't challenge on appeal, Your Honor. Yeah. We did not challenge the district court's determination of what those mean. The question is whether or not the community-wide standard— I understand, but you just cited a provision which referred to the architectural, and I'm saying that's irrelevant to what's before us. What's before us is the declaration—the rules and regulation, which are part of the declaration documents. I would contest that, Your Honor. The 6.1 is the community-wide standard, and the community-wide standard includes the architectural guidelines. I know. So to say that the declarant is subject to the community-wide standard is saying that it's subject to the architectural guidelines when those guidelines say they don't apply to the declarant. And that's why 6.1 has to be interpreted the way it's written, and that is owners of units in private amenities. Now, you're trying to claim an exception to the architectural things, but that provision does not address rules and regulations, which is a separate document. I would agree with that, Your Honor. I was only addressing 6.1. 6.1 doesn't involve the rules and regulations. 6.1 says the whole declarations, doesn't it? It's the maintenance. 6.1 only deals with maintenance of property. And, Your Honor, that is limited to owners. In a manner consistent with the governing documents, and the governing documents include the rules and regulations, right? That is true, Your Honor. All right. Well, I don't know how that could be clear. But, Your Honor, I would suggest the use of the capital term O could not be clear either, and I would simply note that's the maximum. There's two answers to that. Number one, there's two other indicators. First, the whole title to the section is maintenance of units and private amenities. And then the second is that the unit owner is capitalized, and they want to describe that. But they also then added private amenity, which is not a unit owner situation. They probably should have added an owner of a private amenity. But what indicates further is that the next clause talks about all landscaping and improvements shall be subject to the documents. And it seems to me it's clumsy. I agree. You have that argument, but it seems to me the district court read it in this way, which only way it can make sense. I mean, they're addressing maintenance of units and private amenities. Of owners, Your Honor. Again, I would just- It doesn't say that in the title. It does not say in the title. And then it describes that below. It does say in the substance, Your Honor. And with the section Judge Berner pointed out, it says landscape in the section you were referring to. Private amenities are excluded from control over landscaping. So, Your Honor, the only way to make it make sense is if you say it's an owner who has either a unit or private amenity. And I'm going to mangle this because I did not take Latin in high school, Your Honor. But the maxim expressio unius exclusio ulterius, which is accepted in Virginia, means the exclusion of one thing implies, excuse me, the inclusion of one thing implies the exclusion of others. When you use the word capital O owner at the beginning of the sentence, then that applies grammatically to the rest. Private amenity is not set off by comments. It is the owner of a unit or private amenity. I know, but what the drafter wanted to use, owners of units and owners of private amenities and wanted to use the one subject. With respect to the units, it is a capital O. With respect to the private amenities, it's a small O. But it's private amenities, units and private amenities are governed by it. And it says in the very next clause, all units and private amenities are subject to the. Again, I would disagree, Your Honor. It says each owner shall maintain his or her unit or private amenity. In that sentence, structurally, owner modifies unit and private amenity. And if we're going to insert an additional clause, each owner shall maintain his or her unit or a regular owner's private amenities, small O owners. We're rewriting the sentence. And that's something Virginia law does not allow, Your Honor. I see my time is up. I do thank the court for its time. Do you have some rebuttal time here because of your cross appeal? Yes. All right. How much time did we reserve for you? Five minutes. Okay. And I want to focus on the question regarding the mediation and also the district court's finding, the mediation ADR provisions and also the district court's finding that the due process requirements under the bylaws were not followed. And therefore, the association could not enforce, in this case, the violations that it found. First of all, and I want to be very clear here, there was a mediation regarding the maintenance of the property and planting of trees by JBWK. That occurred at a time before there was any assignment of declarant rights. And it was JBWK that was planting trees and they were not maintaining their property. And at joint appendix 47 and in JBWK's reply brief at page 50, they concede that and they stipulate that they did attend a mediation regarding the tree issue and the maintenance of the property generally. There's also in the joint appendix that the association did hold a due process hearing and JBWK attended that due process hearing. That's at joint appendix page 685. Also at 14 and 44 in the complaint and the answer, they admit the allegation that they attended a due process hearing. Furthermore, section 8.4 of the declaration, joint appendix at 85, provides that This is in section 8.4 at the top of page 85. In addition, the board may take the following enforcement procedures to ensure compliance with the governing documents without the necessity of compliance with the procedures set forth in section 3.24 of the bylaws. And Romanette 2 of that section says bringing suit at law or equity to enjoin any violation or to recover monetary damages or both. And so the action by the association in this case for JBWK's failure to maintain the property by planting trees in violation of the declaration. Which as the court found was a violation of the declaration. But the district court held that the association was not allowed to enforce that because it had not complied with the bylaws. Section 8.4 specifically allows the association to undertake that without complying with the bylaws. Number one. And number two, JBWK admits in the record is clear that there was a due process hearing held. JBWK did appear to that as part of the due process under the bylaws. So the district court erred in not allowing the association's enforcement action to proceed. When it came to the mediation, and they're in the record, there's some exchange of emails that are at page 537 and 530 of the joint appendix. And that was broached with the topic of, hey, we're going to plant more trees. And the email said, does the association still contend that planting trees violates the declaration? And we responded that, yes, we still take that position and we don't need to mediate that again because we've already mediated that. And the district court, in its opinion, found that the other issues were also in dispute. And that's at page 962, but the record does not show that there was any communication between the parties regarding JBWK's contention that they were the declarant, that JBWK disputed the amendments to the declaration. And in fact, the JA35, JBWK admits that prior to it filing litigation, it never raised those claims to the association. So with respect to the mediation condition precedent, and the email exchange is also clear that both parties were waiving the mediation as to the tree maintenance issue. But they were reserving their rights as to all other issues, and those other issues were never presented as claims prior to JBWK filing suit in the federal court. And so to the extent that the mediation provision applies, which we believe it does, it applies to the new claims asserted by JBWK that the association's amendments were invalid, and that it was a declarant. Thank you. Thank you. Will, do you have anything further?  I don't have any further. Yeah, okay. Thank you. You'll get just more on- We're going to adjourn for the day.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Nicole G. Berner